Todd A. Walburg (SBN 213063)
**CUTTER LAW, P.C.**
4179 Piedmont Avenue, 3rd Floor
Oakland, CA 94611
Telephone: (510) 281-5881
Facsimile:  (916) 588-9330
*twalburg@cutterlaw.com*

Attorneys for Plaintiff,
HILARY DAVIS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HILARY DAVIS,<br><br>              Plaintiff,<br>     vs.<br><br>McKESSON CORPORATION; McKESSON MEDICAL-SURGICAL INC.; GUERBET, LLC; MALLINCKRODT, INC.; MALLINCKRODT LLC; ENTERPRISE HOLDINGS, INC. WHICH WILL DO BUSINESS IN CALIFORNIA AS MALLINCKRODT PHARMACEUTICALS; MALLINCKRODT MANUFACTURING LLC; LIEBEL-FLARSHEIM COMPANY LLC; CURASCRIPT, INC.; AMERISOURCEBERGEN CORPORATION; AMERISOURCEBERGEN DRUG CORPORATION; and DOES 1 through 20, inclusive,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>1) STRICT LIABILITY: FAILURE TO WARN;<br>2) NEGLIGENCE;<br>3) FRAUD: MISREPRESENTATION;<br>4) FRAUD: CONCEALMENT, SUPPRESSION, OR OMISSION OF MATERIAL FACTS;<br>5) NEGLIGENT MISREPRESENTATION;<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff, Hilary Davis (hereinafter "Plaintiff"), and alleges as follows:

**PARTIES**

1. Plaintiff Hilary Davis a resident of Scottsdale, Arizona.  She was administered a drug called Optimark which was sold by McKesson Corporation of San Francisco, California.

2. Plaintiff suffers from Gadolinium Deposition Disease ("GDD").  GDD is an incurable, painful disease.  Plaintiff contracted GDD as a result of receiving MRIs and MRAs

-1-
COMPLAINT FOR DAMAGES

using intravenous injections of a gadolinium-based contrast agent known as Optimark.

3. Guerbet, LLC; Mallinckrodt Inc.; Mallinckrodt LLC; Enterprise Holdings, Inc. Which Will Do Business In California As Mallinckrodt Pharmaceuticals; Mallinckrodt Manufacturing LLC; and Liebel-Flarsheim Company LLC (collectively referred to as "Manufacturing Defendants") manufacture, market and sell Optimark, a gadolinium-based contrast agent that was injected into Plaintiff's body.

4. Defendant Guerbet, LLC is a Delaware corporation with its principal place of business in Indiana.

5. Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Missouri. Defendant Mallinckrodt Inc. conducted and sponsored clinical trials of Optimark in California. For example, in 2003, Mallinckrodt Inc. conducted a study on the safety, efficacy, and pharmacokinetics of Optimark in San Diego.

6. Defendant Mallinckrodt LLC is a Delaware corporation with its principal place of business in Missouri. Defendant Mallinckrodt LLC conducted and sponsored clinical trials of Optimark in California. For example, in 2003, Mallinckrodt LLC conducted a study on the safety, efficacy, and pharmacokinetics of Optimark in San Diego.

7. Defendant Enterprise Holdings, Inc. Which Will Do Business In California As Mallinckrodt Pharmaceuticals is a Delaware corporation with its principal place of business in Missouri.

8. Defendant Mallinckrodt Manufacturing LLC is a Delaware corporation with its principal place of business in Missouri.

9. Defendant Liebel-Flarsheim Company LLC is a Delaware corporation with its principal place of business in Missouri.

10. Defendants Enterprise Holdings, Inc. Which Will Do Business In California As Mallinckrodt Pharmaceuticals and Mallinckrodt Manufacturing LLC have a facility in Mountain View, California.

11. Defendant Liebel-Flarsheim Company is duly authorized to conduct business in the State of California and does business in San Francisco County. Said Defendant has elected to

establish an agent for service of process in the State of California.

12. At all times relevant to this complaint, Manufacturing Defendants advertised, promoted, marketed, distributed, and sold Optimark in California and nationwide.

13. The true names and capacities of those Defendants designated as Does 1-10 are unknown to Plaintiff. Plaintiff alleges on information and belief that Does 1-10 manufactured gadolinium-based contrast agents that were injected into Plaintiff and/or manufactured MRI and MRA machines with which MRIs and/or MRAs were performed on Plaintiff using gadolinium-based contrast agents. Plaintiff alleges on information and belief that each of these fictitiously named defendants bears some legal responsibility for the events and damages set forth in this complaint.

14. Plaintiff alleges on information and belief that Does 1-10 were and are companies authorized to do and doing business in the State of California and have regularly conducted business in the County of San Francisco, State of California.

15. Plaintiff will amend this Complaint if necessary to show the identity of each fictitiously named Defendant when they have been ascertained.

16. The Manufacturing Defendants, along with Does 1-10, are collectively referred to as the Manufacturing Defendants.

17. Defendant McKesson Corporation ("McKesson") distributes Optimark and other gadolinium-based contrast agents in California and elsewhere. Plaintiff alleges that McKesson distributed the Optimark and/or other gadolinium-based contrast agents that were injected into Plaintiff.

18. Defendant McKesson Corporation is a Delaware corporation with its principal place of business and headquarters at One Post Street, San Francisco, San Francisco County, California.

19. McKesson Corporation is duly authorized to conduct business in the State of California and does business in San Francisco County.

20. At all times relevant to this complaint, McKesson Corporation sold Optimark and/or other gadolinium-based contrast agents in San Francisco County and elsewhere.

21. Defendant Curascript, Inc. distributes Optimark and/or other gadolinium-based contrast agents in California and elsewhere.  Plaintiff alleges that Curascript, Inc. distributed the Optimark and/or other gadolinium-based contrast agents that were injected into Plaintiff.

22. Defendant Curascript, Inc. is a Delaware corporation with its principal place of business in Missouri.  Defendant Curascript, Inc. is duly authorized to conduct business in the State of California and does business in San Francisco County.  Said Defendant has elected to establish an agent for service of process in the State of California.

23. At all times relevant to this complaint, Curascript, Inc. sold Optimark and/or other gadolinium-based contrast agents in California.

24. Defendant Amerisourcebergen Corporation distributes Optimark and/or other gadolinium-based contrast agents in California and elsewhere.  Plaintiff alleges that Amerisourcebergen Corporation distributed the Optimark and/or other gadolinium-based contrast agents that were injected into Plaintiff.

25. Defendant Amerisourcebergen Corporation is a Delaware corporation with its principal place of business in Pennsylvania.  Defendant Amerisourcebergen Corporation is duly authorized to conduct business in the State of California and does business in San Francisco County.  Said Defendant has elected to establish an agent for service of process in the State of California.

26. At all times relevant to this complaint, Amerisourcebergen Corporation sold Optimark and/or other gadolinium-based contrast agents in California.

27. Defendant Amerisourcebergen Drug Corporation distributes Optimark and/or other gadolinium-based contrast agents in California and elsewhere.  Plaintiff alleges that Amerisourcebergen Drug Corporation distributed the Optimark and/or other gadolinium-based contrast agents that were injected into Plaintiff.

28. Defendant Amerisourcebergen Drug Corporation is a Delaware corporation with its principal place of business in Pennsylvania. Defendant Amerisourcebergen Drug Corporation is duly authorized to conduct business in the State of California and does business in San Francisco County.  Said Defendant has elected to establish an agent for service of process in the

State of California.

29. At all times relevant to this complaint, Amerisourcebergen Drug Corporation sold Optimark and/or other gadolinium-based contrast agents in California.

30. The true names and capacities of those Defendants designated as Does 11-20 are unknown to Plaintiff.  Plaintiff alleges on information and belief that Does 11-20 distributed gadolinium-based contrast agents that were injected into Plaintiff.  Plaintiff alleges on information and belief that each of these fictitiously named Defendants bear some legal responsibility for the events and damages set forth in this Complaint.

31. Plaintiff alleges on information and belief that Does 11-20 were and are companies authorized to do and doing business in the State of California and have regularly conducted business in the County of San Francisco, State of California.

32. Plaintiff will amend this Complaint if necessary to show the identity of each fictitiously named defendant when they have been ascertained.

33. McKesson, Curascript, Inc., Amerisourcebergen Corporation, Amerisourcebergen Drug Corporation, along with Does 11-20, are collectively referred to as the Distributor Defendants.

34. The Manufacturing Defendants and the Distributor Defendants are collectively referred to as Defendants.

## JURISDICTION AND VENUE

35. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). The amount in controversy exceeds $75,000.00 exclusive of interest and costs. There is complete diversity of citizenship between Plaintiff and Defendants. Plaintiff is a resident and citizen of and is domiciled in the State of Arizona. As set forth more fully above, all Defendants are entities organized in states other than the State of Arizona, all Defendants have their principal place of business in a state other than the State of Arizona, and none of the Defendants is a citizen or resident of the State of Arizona. Defendant McKesson Corporation is a Delaware corporation with its principal place of business and headquarters at One Post Street, San Francisco, San Francisco County, California. As indicated above, Mallinckrodt Defendants

conducted clinical trials regarding the safety and efficacy of Optimark in the State of California.

36. This Court has personal jurisdiction over Defendants, each of which is licensed to conduct and/or is systematically and continuously conducting business in the State of California, including, but not limited to, the marketing, advertising, selling, and distributing of drugs, including Optimark, to the residents in this State.

37. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), because Defendants marketed, advertised, and distributed the dangerous product in this District; Defendants do substantial business in the State of California and within this District; and at all times relevant hereto, Defendants developed, manufactured, promoted, marketed, distributed, warranted, and sold Optimark in interstate commerce.

**INTRADISTRICT ASSIGNMENT**

38. Assignment to the San Francisco division of this Court is appropriate under Civil Local Rule 3-2(c) and (d) as a substantial part of the events or omission which give rise to the claim occurred in San Francisco County. This assignment is also appropriate because Defendant McKesson Corporation is headquartered in San Francisco, within San Francisco County.

**FACTS**

39. Plaintiff Hilary Davis had normal kidney function prior to developing Gadolinium Deposition Disease ("GDD"). Plaintiff Hilary Davis, was subjected to one or multiple MRAs and/or MRIs. At the time of these procedures, Plaintiff was injected with the gadolinium-based contrast agent, Optimark. Unbeknownst to her, she developed GDD soon thereafter. Plaintiff Hilary Davis' symptoms of GDD include but are not limited to the following: extreme cognitive impairment; difficult mentation; headaches; swollen, red, thickening, and peeling skin; and pain throughout her body.

40. Gadolinium Deposition Disease ("GDD") is the name for a disease process observed in people with normal or near-normal renal function who develop persistent symptoms that arise hours to months after the administration of gadolinium-based contrast agents like Optimark. In these cases, no preexistent disease or subsequently developed disease of an alternate known process is present to account for the symptoms. People suffering from GDD

experience symptoms consistent with the known toxic effects of retained gadolinium. Typical clinical features of GDD include persistent headaches, bone and joint pain, and clouded mental activity. People with GDD often experience subcutaneous soft-tissue thickening that clinically appears somewhat spongy or rubbery. Tendons and ligaments in a comparable distribution may also be painful and have a thickened appearance. People with GDD often experience excruciating pain, typically in a distal distribution, of the arms and legs but may also be in the torso or generalized in location. This pain is often described as feeling like sharp pins and needles, cutting, or burning. GDD often progresses to painful inhibition of the ability to use the arms, legs, hands, feet, and other joints. GDD is a progressive disease for which there is no known cure.

41. GDD is a man-made disease. It only occurs in patients who have received a gadolinium-based contrast agent for an MRI or an MRA.

42. Gadolinium is a highly toxic heavy metal. It does not occur naturally in the human body. The only known route for gadolinium to enter the human body is injection of a gadolinium-based contrast agent.

43. Because gadolinium is toxic, it must be coated to keep it from coming into contact with human tissue when used in connection with MRIs or MRAs. This coating process is called chelation.

44. The gadolinium-based contrast agents (including Optimark) injected into Plaintiff were manufactured by the Manufacturing Defendants and distributed by the Distributor Defendants.

45. During the years that Defendants have manufactured, marketed, distributed, sold, and administered gadolinium-based contrast agents, there have been numerous case reports, studies, assessments, papers, peer reviewed literature, and other clinical data that have described and/or demonstrated GDD in connection with the use of gadolinium-based contrast agents. In addition, there has been a significant number of publicized complaints and comments from those individuals afflicted with GDD and others seeking to help these individuals. This information was all available to the Defendants several years ago, and put them on notice of the issues that

give rise to Plaintiff's causes of action alleged herein.

46. Plaintiff received MRIs and/or MRAs utilizing gadolinium-based contrast agents (including Optimark).

47. During the time period when Plaintiff received injections of the Manufacturing Defendants' gadolinium-based contrast agents, Defendants knew or should have known that the use of gadolinium-based contrast agents created a risk of serious bodily injury in patients with normal or near-normal kidney function.

48. Defendants failed to warn Plaintiff and her healthcare providers about the serious health risks associated with gadolinium-based contrast agents (including Optimark), and failed to disclose the fact that there were safer alternatives.

49. As a direct and proximate result of receiving injections of gadolinium-based contrast agents manufactured, distributed, marketed, and/or sold by Defendants (including Optimark), Plaintiff developed GDD.

50. Defendants have repeatedly and consistently failed to advise consumers and/or their healthcare providers of the causal relationship between gadolinium-based contrast agents and GDD.  Defendants knew or should have known of the risk of GDD posed by gadolinium-based contrast agents (including Optimark) to individuals with normal or near-normal kidney function.

51. Had Plaintiff and/or her healthcare providers been warned about the risks associated with gadolinium-based contrast agents (including Optimark), she would not have been administered gadolinium-based contrast agents and would not have been afflicted with GDD.

52. As a direct and proximate result of Plaintiff's being administered gadolinium-based contrast agents (including Optimark), she has suffered severe physical injury and pain and suffering, including, but not limited to, the effects of GDD.

53. As a direct and proximate result of being administered gadolinium-based contrast agents (including Optimark), Plaintiff suffered and continues to suffer significant mental anguish and emotional distress and will continue to suffer significant mental anguish and emotional distress in the future.

54. As a direct and proximate result of being administered gadolinium-based contrast agents (including Optimark), Plaintiff has also incurred medical expenses and other economic damages and will continue to incur such expenses in the future.

## APPLICATION OF THE DISCOVERY RULE AND THE HISTORY OF DEFENDANTS' FRAUDULENT CONCEALMENT OF INFORMATION

55. The nature of Plaintiff's injuries and damages, and their relationship to gadolinium-based contrast agents used in conjunction with MRIs and MRAs (including Optimark), was not discovered, and through reasonable care and due diligence could not have been discovered, by Plaintiff, until a time less than two years before the filing of this Complaint. On or about August 29, 2015, Plaintiff became aware that she had retained gadolinium from the Optimark gadolinium-based contrast agent that was injected into her.

56. Plaintiff became aware of GDD in August 2016 upon publication of "Gadolinium in Humans: A Family of Disorders," in volume 207:2 of the American Journal of Roentgenology.

57. In 1984--prior to FDA approval-- the inventors of gadolinium-based contrast agents claimed that their product Gd-DTPA did not cross the blood-brain barrier and that the bonds between the Toxic Gadolinium and its protective coating did not break inside the body. Additionally, they claimed that there would be no toxic gadolinium residue left behind to cause illness.

58. Magnevist was the first gadolinium-based contrast agent to reach the market after receiving FDA approval in 1988. There are two basic types of contrast agents differentiated by their chemical structure which include linear agents and macrocyclic agents. The main difference is that the linear agents do not fully surround the gadolinium ion, whereas the macrocyclic agents form a complete ring around gadolinium ion which creates a much more difficult bond to break. The linear agents include: Magnevist (manufactured by Bayer) along with Omniscan (manufactured by GE Healthcare), Optimark (manufactured by Manufacturing Defendants), and Multihance (manufactured by Bracco). Greater safety due to the stronger bonds of the macrocyclic contrast agents as compared to their linear contrast counterparts has been well established by scientists (Huckle, et al. 2016).

59. Then, coincidentally again in 1988 it was recognized that gadolinium was breaking free from the bonds in the linear based contrast agents and this was in part due to the competition for its protective layer (chelate) by other essential metals in the body such as zinc, copper, and iron (Huckle, et al. 2016). Furthermore, emerging science showed that the bond between toxic gadolinium and its chelate or cage (Gd-DTPA) became very weak and separates easily in low pH conditions such as those found in many compartments of the human body including extracellular fluid spaces.

60. Stability differences among gadolinium contrast agents have long been recognized in laboratory (in vitro), and deposition of toxic gadolinium in tissues has been described in animal models since at least 1984. The first major study that showed deposition in humans appeared in 1998 regarding patients with renal failure and later in 2004 in patients with normal renal function (Huckle, et al. 2016).

61. The laboratory (in vitro) studies assessing the stability of each gadolinium-based contrast agent in human blood were performed and demonstrated that, over time, greater percentages of gadolinium were released from linear agents as compared to the macrocyclic agents which showed superior stability. The lack of stability seen within the linear agents was not considered to be a problem as long as the contrast agent was excreted out of the body according to the claimed drug's half-life, before the chelate could release the toxic gadolinium. However, it was later noted that other conditions could cause prolonged retention of the contrast agents, thus allowing more toxic gadolinium to be released in the bodies of patients. In addition, a delayed elimination phase of the gadolinium-based contrast agents would later be discovered.

62. Peer-reviewed articles on the deposition of gadolinium in animals with normal renal function, some illustrating deleterious consequences, have been published as early as 1984.

63. Three months after the FDA approval of Omniscan (a linear contrast agent with a similar structure to Optimark) the preclinical safety assessment and pharmacokinetic data were published describing its pharmacokinetics in rats, rabbits, and cynomolgus monkeys. These studies demonstrated that while toxic gadolinium was no longer detectable in the blood 7-days after administration, quantifiable concentrations of gadolinium were persistent in both the renal

cortex and areas around bone cartilage.

64. The first report of toxic gadolinium retention in humans may have been presented in September 1989, a little over 1 year after the approval of Magnevist. Authors Tien et al. reported that intracerebral masses "remained enhanced on MRI images obtained 8 days after injection of gadolinium DTPA dimeglumine (Magnevist)." Subsequent chemical analysis revealed that a high concentration of gadolinium remained in the tissue. After this report, however, there was no further mention of gadolinium retention in humans until 1998.

65. Manufacturing Defendants knew that their product Optimark did not have very stable bonds and could come apart easily causing significant toxicity in humans.

66. Over the next 18 years, more evidence was forthcoming and research began to flourish regarding the release of toxic gadolinium from the linear contrast agents such as Optimark, and its long-term retention in the bodies of animals and humans. Nephrologists and other scientists connected the administration of linear gadolinium-based contrast agents including Optimark, to a rapidly progressive debilitating and often fatal condition called Gadolinium induced Nephrogenic Systemic Fibrosis (NSF), prompting the Food and Drug Administration (FDA) to issue a black box warning on all gadolinium based contrast agents in 2006. NSF is a horrible disease were patients' skin and vital organs would fibrose, becoming wood-like. There were over 500 NSF cases reported and estimated to be well over a thousand non-reported. Over 500 lawsuits were filed against gadolinium-based contrast manufacturers. All of them settled before trial except *Decker vs. GE* (Omniscan), which resulted in a five-million-dollar verdict for Mr. Decker. Unfortunately, Mr. Decker passed away from his Gadolinium triggered disease before the verdict was reached.

67. Because obvious signs of clinical pathology associated with NSF were only seen in patients who had severely reduced renal function, it was widely (and wrongly) assumed by the public that people with normal renal function were not getting sick and there were no other concerns. However, research continued to report evidence that toxic gadolinium was being stored in people with normal renal function.

68. Although many patients with debilitating symptoms who had normal renal

function that received injections with Gadolinium-based contrast agents had already been reporting adverse reactions for years to the FDA, manufacturers, and poison control, no link between Gadolinium and their symptoms were ever officially made publicly. This is partially due to the fact that blood and urine testing for Gadolinium only became available recently. Additionally, most doctors were not aware of any disease that was associated with Gadolinium other than NSF, which is said to only occur in patients with renal failure. Gadolinium Toxicity is an underreported and underdiagnosed condition. Over the past six years (since the link between gadolinium-based contrast agents and NSF was acknowledged) patients with normal renal function have been forming advocacy groups and coming forward to create awareness for their condition. Symptomatic patients often have documentation of high levels of gadolinium in their blood and urine several days, weeks, months and even years after their exposure to gadolinium-based contrast agents. Many patients even had tissue biopsies of various parts of their body that showed additional evidence of retained gadolinium years after their exposure.

69. Patients sent several strongly worded letters with scientifically-supported research data to the FDA, warning about the occurrence of gadolinium toxicity in those with normal renal function following injections of gadolinium-based contrast agents. Correspondence was confirmed in 2012.

70. In 2013, while examining non-contrast enhanced MRI images, Japanese researchers found evidence of retained gadolinium in the brains of patients with normal renal function that had previously received one or more injections of gadolinium-based contrast agents up to several years prior. They found that the brain had hyperintense signals in critical areas of the brain. These were very alarming findings.

71. These findings were confirmed by scientists at the Mayo Clinic in 2014 when autopsy studies were performed on 13 deceased individuals, all of whom had normal or near normal renal function and who had received six or more injections of gadolinium-based contrast agents in the years prior. Up to 56 mcg of gadolinium per gram of desecrated tissue were found within the brains of these patients.

72. As these new findings emerged, the entire radiology community was put on high

alert, with several large universities conducting research to further address this concern.

73. In July of 2015, and in direct response to the Mayo Clinic study's findings, the FDA issued a new public safety alert. The FDA is evaluating the risk of brain deposits from repeated use of Gadolinium-based contrast agents use in MRI's and they now have their National Center for Toxicological Research team working on determining the exact consequences of these new findings.

74. Defendants have known about the risks that gadolinium-based contrast agents (including Optimark) pose to people with normal kidney function for years. Pharmacokinetic studies in 1991 indicated that gadolinium retention was occurring in people with normal renal function.[1] In 2004, gadolinium was shown to be deposited in the resected femoral heads of people who had undergone gadolinium-chelate enhanced MRI studies.[2] Since then, studies have continued to indicate that gadolinium remains within people's bodies long after the suggested half-life.

75. Despite this well-documented evidence of gadolinium retention, Defendants have continuously failed to warn consumers and their healthcare providers on the label of their product, Optimark. In 2012, Defendants corrected their label to include contraindications for use in people with kidney disease and acute kidney injury. Yet, Defendants have failed to update their label to reflect the extensive evidence of gadolinium retention in people with normal renal function.

76. Defendants were also involved in prior litigation (in the San Francisco Superior Court Complex Civil Litigation Department and a federal MDL) involving this very product, and have made statements about this product denying that it causes the types of injuries alleged in this complaint.

77. Defendants are estopped from asserting a statute of limitations defense because all Defendants fraudulently concealed from Plaintiffs the nature of Plaintiffs' injuries and the

---

[1] Schumann-Giampieri G, Krestin G. Pharmacokinetics of Gd-DTPA in patients with chronic renal failure. *Invest Radiol.,* 1991; 26:975-979.

[2] Gibby WA, Gibby KA, Gibby WA. Comparison of Gd DTPA-BMA (Omniscan) versus Gd HP-DO3 (ProHance) retention in human bone tissue by inductively coupled plasma atomic emission spectroscopy. *Invest Radiol.,* 2004; 39:138-142.

connection between their injuries and all Defendants' tortious conduct.

## FIRST CAUSE OF ACTION

### (Against All Defendants)

### STRICT LIABILITY: FAILURE TO WARN

78. Plaintiff incorporates by reference and realleges each paragraph set forth above.

79. Defendants' gadolinium-based contrast agents (including Optimark), and MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents, were defective due to inadequate warnings or instruction for use, both prior to marketing and post-marketing. Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers. Defendants failed to adequately warn consumers and their healthcare providers of such risks.

80. Because of Defendants' failure to provide adequate warnings with their products, Plaintiff was injected with gadolinium-based contrast agents (including Optimark) which the Defendants manufactured, designed, sold, supplied, marketed, or otherwise introduced into the stream of commerce. Those gadolinium-based contrast agents (including Optimark) are the legal cause of Plaintiff's serious physical injuries, harm, damages, and economic loss. Plaintiff will continue to suffer such harm, damages, and economic loss in the future.

81. The foregoing acts, conduct and omissions of Defendants were vile, base, willful, malicious, wanton, oppressive and fraudulent, and were done with a conscious disregard for the health, safety and rights of Plaintiff and other users of Defendants' products, and for the primary purpose of increasing Defendants' profits. As such, Plaintiff is entitled to exemplary damages.

## SECOND CAUSE OF ACTION

### (Against All Defendants)

### NEGLIGENCE

82. Plaintiff incorporates by reference and realleges each paragraph set forth above.

83. Defendants had a duty to exercise reasonable care in the design, formulation, testing, manufacture, labeling, marketing, sale and/or distribution of gadolinium-based contrast agents (including Optimark) and the MRI and MRA machines designed to be used in conjunction

with gadolinium-based contrast agents. In particular, they had a duty to assure that their products did not pose an unreasonable risk of bodily harm and adverse events.

84.  Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, marketing, or distribution of gadolinium-based contrast agents (including Optimark) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents in that they knew or should have known that the products could cause significant bodily harm or death and were not safe for use by certain types of consumers.

85.  Defendants failed to exercise ordinary care in the labeling of gadolinium-based contrast agents (including Optimark) and the labeling of MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents and failed to issue to consumers and their health care providers adequate warnings concerning the risks of serious bodily injury due to the use of gadolinium-based contrast agents (including Optimark) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents.

86.  Despite the fact that Defendants knew or should have known that gadolinium-based contrast agents (including Optimark) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents posed a serious risk of bodily harm to consumers, Manufacturing and Distributor Defendants unreasonably continued to manufacture and market gadolinium-based contrast agents (including Optimark) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents and failed to exercise reasonable care with respect to post-sale warnings and instructions for safe use.

87.  At all relevant times, it was foreseeable to Defendants that consumers like Plaintiff would suffer injury as a result of their failure to exercise ordinary care as described above.

88.  As a direct and proximate result of Defendants' negligence, Plaintiff has suffered physical injuries, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

/ / /

/ / /

/ / /

## THIRD CAUSE OF ACTION

### (Against the Manufacturing Defendants)

### FRAUD

89. Plaintiff incorporates by reference and realleges each paragraph set forth above.

90. Manufacturing Defendants knowingly and intentionally made materially false and misleading representations to Plaintiff's healthcare providers and to the public, to the effect that gadolinium-based contrast agents (including Optimark) were safe for use and that their labeling, marketing, and promotional materials fully described all known risks associated with their product.

91. Manufacturing Defendants' representations were in fact false. Gadolinium-based contrast agents (including Optimark) are not safe for use and Defendants' labeling, marketing, and promotional materials did not fully describe all known risks of the products.

92. Manufacturing Defendants had actual knowledge that gadolinium-based contrast agents (including Optimark) created an unreasonable risk of serious bodily injury to consumers.

93. Manufacturing Defendants knowingly and intentionally omitted this information from their labeling, marketing, and promotional materials, and instead, labeled, promoted, and marketed their products as safe for use in order to increase and sustain sales.

94. When Manufacturing Defendants made representations that gadolinium-based contrast agents (including Optimark) were safe for use, they knowingly and intentionally concealed and withheld from Plaintiff, her physicians, and the public, the fact that their gadolinium-based contrast (including Optimark) agents are not safe for use.

95. Manufacturing Defendants had a duty to disclose that gadolinium-based contrast agents (including Optimark) are not safe for use. Manufacturing Defendants had superior knowledge of these facts that were material to Plaintiff and her healthcare providers' decisions to use gadolinium-based contrast agents (including Optimark).

96. Plaintiff and her healthcare providers reasonably and justifiably relied on the Manufacturing Defendants' representations that gadolinium-based contrast agents (including Optimark) were safe for human use and that Manufacturing Defendants' labeling, marketing and

promotional materials fully described all known risks associated with the products.

97.  Plaintiff did not know, and could not have learned of the facts that the Defendants omitted and suppressed. The facts suppressed and concealed by the Defendants are material. Had Plaintiff and her healthcare providers known that gadolinium-based contrast agents (including Optimark) are not safe for use, Plaintiff would not have been injected with gadolinium-based contrast agents.

98.  As a direct and proximate result of Manufacturing Defendants' misrepresentations and concealment, Plaintiff was administered gadolinium-based contrast agents (including Optimark) and has suffered serious physical injury, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

99.  The foregoing acts, conduct and omissions of Manufacturing Defendants were vile, base, willful, malicious, wanton, oppressive and fraudulent, and were done with a conscious disregard for the health, safety and rights of Plaintiff and other users of Manufacturing Defendants' products, and for the primary purpose of increasing Manufacturing Defendants' profits. As such Plaintiff is entitled to exemplary damages.

## FOURTH CAUSE OF ACTION

### (Against the Manufacturing Defendants)

### FRAUD: CONCEALMENT, SUPPRESSION OR OMISSION OF MATERIAL FACTS

100.  Plaintiff incorporates by reference and realleges each paragraph set forth above.

101.  Manufacturing Defendants omitted, suppressed, or concealed material facts concerning the dangers and risk associated with the use of their gadolinium-based contrast agents (including Optimark), and the fact that safer alternatives were available. Further, Manufacturing Defendants purposely downplayed and understated the serious nature of the risks associated with use of their gadolinium-based contrast agents (including Optimark) in order to increase and sustain sales.

102.  As a direct and proximate result of Manufacturing Defendants' concealment of material facts, Plaintiff was administered gadolinium-based contrast agents (including Optimark) and has suffered physical injury, harm, damages, and economic loss and will continue to suffer

such harm, damages, and economic loss in the future.

103. The foregoing acts, conduct and omissions of Manufacturing Defendants were vile, base, willful, malicious, wanton, oppressive and fraudulent, and were done with a conscious disregard for the health, safety and rights of Plaintiff, and other users of Manufacturing Defendants' products, and for the primary purpose of increasing Manufacturing Defendants' profits. As such, Plaintiff is entitled to exemplary damages.

## FIFTH CAUSE OF ACTION

## (Against the Manufacturing Defendants)

## NEGLIGENT MISREPRESENTATION

104. Plaintiff incorporates by reference and realleges each paragraph set forth above.

105. Manufacturing Defendants supplied the public and Plaintiff's healthcare providers with materially false and incomplete information with respect to the safety of their gadolinium-based contrast agents (including Optimark).

106. The false information supplied by Manufacturing Defendants was that gadolinium-based contrast agents (including Optimark) were safe.

107. In supplying this false information, Manufacturing Defendants failed to exercise reasonable care.

108. The false information communicated by Defendants to Plaintiff and her healthcare providers was material and Plaintiff justifiably relied in good faith on the information to her detriment.

109. As a direct and proximate result of Defendants' misrepresentations, Plaintiff was administered gadolinium-based contrast agents (including Optimark) and has suffered physical injury, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

WHEREFORE, Plaintiff prays for relief as follows:

1. For an injunction prohibiting Defendants from engaging in the following conduct which violates the CLRA:

    a. Marketing, promoting, or selling Optimark for use with MRAs and other uses and

off-label uses;

    b. Marketing, promoting, or selling Optimark, as safe and effective;

    c. Marketing, promoting, or selling Optimark by representing that MRIs and MRAs using gadolinium-based contrast agents are safer or more effective than other imaging methods that do not require the use of gadolinium-based contrast agents;

    d. Marketing, promoting, or selling Optimark in any way which implies that those products are safer or superior to other brands of gadolinium-based contrast agents;

    e. Marketing, promoting, or selling Optimark as inert or with words to that effect.

2. Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

3. Past and future medical expenses, income, and other economic damages in an amount to be determined at trial of this action;

4. Punitive damages in an amount to be determined at trial of this action (only applicable to the Defendants and Causes of Action noted above);

5. Pre-judgment and post-judgment interest;

6. Attorneys' fees, expenses, and costs; and

7. Such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

In addition to the above, Plaintiff hereby demands a trial by jury for all causes of action and issues that can be tried by a jury.

Respectfully submitted August 1, 2017.

Dated: August 1, 2017                     CUTTER LAW P.C.

By: *[signature]*
Todd A. Walburg
Attorneys for Plaintiff