C. Brooks Cutter (*pro hac vice*)
Todd A. Walburg (*pro hac vice*)
Margot P. Cutter (*pro hac vice*)
**CUTTER LAW, P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: (916) 290-9440
Facsimile: (916) 588-9330

Zoe Littlepage  (*pro hac vice*)
Rainey C. Booth  (*pro hac vice*)
T. Matthew Leckman (*pro hac vice*)
**LITTLEPAGE BOOTH LECKMAN**
1912 W. Main Street
Houston, Texas 77098
Telephone: (713) 529-8000
Facsimile: (713) 529-8044

Curt Clausen (AZ SBN 019709)
**CLAUSEN & WILLIAMSON PLLC**
2999 North 44th Street, Suite 318
Phoenix, Arizona 85018
Telephone: (602) 285-4450
Facsimile: (602) 285-4473

Attorneys for the Plaintiffs

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Hilary Davis,<br><br>                     Plaintiff,<br><br>vs.<br><br>McKesson Corporation, et al.,<br><br>                     Defendants. | Case No. 2:18-cv-1157-DGC<br>Case No. 2:18-cv-01778-DGC<br>Case No. 4:18-cv-01159-DGC<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION OPINIONS OF JODY TVERSKY, M.D.** |

| | |
|---|---|
| Susan Fischer, | |
| Plaintiff, | |
| vs. | |
| Bayer Healthcare Pharmaceuticals Inc. et al., | |
| Defendants. | |
| Srihari Munnuru, | |
| Plaintiff, | |
| vs. | |
| Guerbet, LLC, et al., | |
| Defendants. | |

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 1

I.       DR. TVERSKY IS WELL QUALIFIED. ............................................................ 1

II.     DR. TVERSKY'S EXPERT OPINIONS "FIT" THE CASE. ............................ 3

III.    DR. TVERSKY'S EXPERT OPINIONS ARE RELEVANT AND RELIABLE. ........................................................................................................... 5

     A.    Dr. Tversky Properly Identifies the Disease State. ............................... 5

IV.    DR. TVERSKY PROPERLY RELIED ON EXTENSIVE LITERATURE TO SUPPORT HIS OPINIONS. ............................................................................. 6

V.     DR. TVERSKY PROPERLY FINDS CAUSATION TO A REASONABLE MEDICAL PROBABILITY. ........................................................................... 7

VI.    DR. TVERSKY CONSIDERED THE STATEMENTS OF FDA AND OTHER REGULATORY BODIES. .................................................................. 8

VII.   CASE REPORTS AND SURVEY EVIDENCE PROPERLY SUPPORT DR. TVERSKY'S OPINIONS. ................................................................................ 9

VIII.  DR. TVERSKY PROPERLY UTILIZES THE ARTICLES HE RELIES UPON. ........................................................................................................... 11

IX.    DR. TVERSKY'S CAUSATION OPINION IS WELL SUPPORTED, AND HE PERFORMS A SOUND BRADFORD HILL ANALYSIS. ....................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fischer v. Bayer Healthcare Pharmaceuticals Inc., et al.*,
  Case No. 2:18-cv-01778-DGC ................................................................................... 1

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
  639 F.3d 11 (1st Cir. 2011) ..................................................................................... 12

*Wendell v. GlaxoSmithKline*,
  858 F.3d 1227 (2017) ...................................................................................... *passim*

*In re Zicam Cold Remedy Mktg., Sales Practices, & Prods. Liab. Litig.*,
  797 F. Supp. 2d 940 (D. Ariz. 2011) ........................................................................ 5

*In re Zicam*,
  supra, 790 F. Supp. 2d at 946 .................................................................................. 6

**Other Authorities**

DR. TVERSKY'S EXPERT OPINIONS "FIT" ............................................................. 3

Ex. 1, *Curriculum Vitae* ................................................................................................ 1

Fed. R. Evid. 702(a) ..................................................................................................... 3

*Journal of Allergy and Clinical Immunology*. Ex. 1 ................................................... 2

Ninth Circuit *Daubert* .................................................................................................. 7

NSF, Doc 73-9 Tversky Report .................................................................................... 6

**INTRODUCTION**

Defendants seek exclusion of Plaintiffs' expert allergist and clinician, Jody Tversky, M.D., arguing that his general causation opinions are mere speculation and that he has "not applied any scientific research or process of his own" to support his opinions. Doc. 77[1] Defendant's Motion to Exclude Dr. Tversky's Testimony at p. 1 ("Motion to Exclude"). From there, Defendants again insist—as they argue extensively in their *Omnibus Motion to Exclude the Testimony of Plaintiffs' Experts*—that Dr. Tversky has ignored the opinions of regulatory agencies and other third parties, that he "misunderstands and mischaracterizes" those third-party statements, and that his opinions otherwise fail for all of the other reasons Defendants already raise in that same omnibus briefing. *Id.*

Insofar as Defendants' instant motion simply retreads their so-called "omnibus" motion, it fails for all the same reasons set forth in Plaintiffs' response thereto. The remainder of Defendants' arguments are addressed throughout, and each of them should be rejected under *Daubert* and *Wendell*. As set forth in detail below, Dr. Tversky is well-qualified and prepared a well-reasoned report after considering the relevant publications and available evidence concerning the health effects of GBCA and his own clinical experience.

**ARGUMENT**

**I.   DR. TVERSKY IS WELL QUALIFIED.**

Dr. Jody Tversky is board certified in internal medicine and allergy. *See* Ex. 1, *Curriculum Vitae* of Jody R. Tversky, M.D. ("Tversky C.V."). He is currently an Assistant Professor and full-time faculty member in the Department of Medicine at the Johns Hopkins University School of Medicine in Baltimore, Maryland. He has also served on the teaching faculty at Mt. Sinai School of Medicine in New York, New York, and from

---

[1] All citations to documents filed on the Court's docket are to those filed in *Fischer v. Bayer Healthcare Pharmaceuticals Inc., et al.*, Case No. 2:18-cv-01778-DGC.

2012 to 2016, as the Clinical Director of the Division of Allergy and Clinical Immunology at Johns Hopkins.

Dr. Tversky's practice is comprised of clinical work—seeing patients on his own and in conjunction with the fellows he supervises—research, and teaching. In clinical practice, he currently sees approximately fifteen to twenty patients per week and has personally treated over 5,000 patients in the clinical setting in the course of his career. Dr. Tversky focuses his practice on allergic conditions and adverse drug reactions, including reactions to biological agents, chemotherapies, and IV contrast media, and he is frequently asked to consult with other physicians on suspected prescription-drug-related health problems. *See* Doc. 73-5, Deposition of Dr. Tversky ("Tversky Depo.") at 260:15—262:3. In that context, he is often asked to provide general causation opinions and has fielded such inquiries in the context of Gadolinium-based Contrast Agents (GBCAs). Ex. 1, Tversky C.V. at 1-2.

Dr. Tversky has published peer-reviewed periodical and educational literature in his field and served on both the Journal Review Committee and Abstract Review Committee for the *Journal of Allergy and Clinical Immunology*. Ex. 1, Tversky C.V., at 1-2, 4, and 6. Over the course of his career, he has been and continues to be active in clinical research, serving as principal investigator in a number of clinical trials. *Id.* at 2-3; *see also* Doc. 73-5, Tversky Depo. at 20:7-23:12, 26:16-31:5. He is a frequent speaker and presenter, conference organizer and session chair, and a Fellow of the American Academy of Allergy Asthma & Immunology (FAAAAI). Ex. 1, Tversky C.V. at 5-6.

As Dr. Tversky explained in his deposition testimony, he is uniquely qualified by his experience and background to analyze and provide conclusions on matters of general causation in the context of drug reactions:

> Q    If the Court wanted to know what makes you unique and what makes your practice useful to answering the questions that we posed to you in this case, what would your answer be?

2

> A    … I would consider certainly an immunologist or someone with my experience or similar experienced individual to be absolutely crucial to determining relevance, causality, because that's what we do.
>
> Most of the other, even the experts that, that have experience treating renal patients or radiologists, for example, do not look in the context of **cause and effect** with the frequency that we do.  **That's essentially our job.**
>
> Our job is to be a Sherlock Holmes, so to speak, to look deeper, to consider the other possibilities, consider the weight of various portions of evidence.  And not only from an epidemiological approach, because epidemiological approach really answers a question on a population basis.  We have to apply those principles on an individual patient as well in the context of the quality of the data.
>
> So we are very good, or at least **I claim to be very good and my colleagues are very good at synthesizing all that data** to make a reasonable determination of whether or not there should be concern.
>
> Should our faculty members consider this in their differential?  I would tell every single one of them to consider this in their differential.  **Should we be concerned if a patient presents with, for lack of terminology, NSF-like syndrome in a patient with normal renal functioning?  Absolutely. I think it would be malpractice not to consider this as a possibility.**  That's very different than what the FDA was charged with, what the European Union was charged with.

Doc. 73-5, Tversky Depo. at 262:16—264:6 (emphasis added).

In short, Dr. Tversky is well-credentialed, extensively experienced in his field, and uniquely qualified to opine on questions of general causation relating to GBCAs and their adverse health effects pursuant to Fed. R. Evid. 702(a).

## II.    DR. TVERSKY'S EXPERT OPINIONS "FIT" THE CASE.

Defendants' first attack on Dr. Tversky is that his opinions do not answer the question posed by the Court, *i.e.*, "whether exposure to gadolinium in the manner at issue in this case is **capable** of causing the injuries and conditions alleged by Plaintiffs." *See* Doc. 11, July 17, 2018 Order at p. 1 (emphasis added).  Defendants are flatly wrong.  Dr. Tversky's general causation opinions plainly and directly answer the Court's inquiry.

The overarching questions posed to Dr. Tversky were these:

> 1. Do linear GBCAs cause health problems in some patients with normal kidney function?
> 2. If so, what range or continuum of health problems do linear GBCAs cause in some patients?

Doc. 73-9, Tversky Report at 1.

As set forth at great length in both his report and deposition testimony, Dr. Tversky's opinions are that linear GBCAs indeed cause health problems in some patients with normal renal function and that the "fundamental tissue injury mechanisms should be the same for renally impaired patients and those with normal renal function." *Id.* at 6. The spectrum of injuries that he documents from both case reports, publications and the FDA data base includes symptoms affecting "skin, muscle, bone and nervous system as well as chronic pain." *Id.* at 7. "As would be expected, the severity of symptoms related to retained gadolinium in renally sufficient patients ranges from limited indolent cases to more severe presentations overlapping with that of end stage NSF." *Id.* at 9; see also Doc. 73-5, Tversky Depo. at 273: 7-11 ("There are frequently observed symptoms that include skin-related issues, bone and joint-related issues, and of course, impaired mentation. That's true for renally impaired patients and renally fully sufficient patients". Doc. 73-5, Tversky Depo. at 283:19-284:14.

Dr. Tversky's opinions address the relevant questions at this threshold general causation stage, and notably, his opinions are entirely in line with the opinions expressed by Defendants to FDA: "However, in patients with a NSF-like syndrome, this syndrome has been reported despite the patient has normal renal function. Conversely, in patients with NSF, documented NSF, there are cases where there is also brain T1 hyperintensities. So our conclusion is that brain hyperintensities and NSF are, in fact, part of the same continuum from gadolinium retention to gadolinium toxicity, and renal dysfunction acts as a catalyst." MIDAC Transcript Sept. 8, 2017 at 106:4-8, Ex. 22. to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Exclude Testimony of Dr. Wagner. It will

eventually be Plaintiffs' burden to prove *specific* causation (*i.e.*, that GBCAs were in fact a cause of their injuries), but at as set forth in Plaintiffs' omnibus response, all three Plaintiffs are indeed experiencing many of the symptoms that Dr. Tversky finds are generally caused by GBCAs. See Plaintiffs' Omnibus Opposition at pp. 20-23.

### III. DR. TVERSKY'S EXPERT OPINIONS ARE RELEVANT AND RELIABLE.

#### A. Dr. Tversky Properly Identifies the Disease State.

Defendants next charge that Dr. Tversky is unreliable because a single, universally accepted "name" has yet to emerge for the labeling or characterization of the symptoms of GBCA-induced toxicity in patients with normal renal function. Doc. 77, Motion to Exclude Dr. Tversky's Testimony at 5. Of course, the term Gadolinium Deposition Disease ("GDD") has been used. Ex. 2, Semelka (2016). However, the published literature and drug labels are often more specific, for example discussing "retention" and resulting "fibrosis" as distinct phenomena. *See e.g.* Doc. 73-30, Magnevist Label; Doc. 73-31, MultiHance Label; Doc. 73-32, OptiMARK Label; Doc. 73-34, McDonald (2018). This precision in the published literature is reflected in Dr. Tversky's report and his failure to use a single label in no way undercuts his opinions.

Defendants also assert that Dr. Tversky's failure to opine on dose or latency make his opinion inadmissible. Doc. 77, Motion to Exclude Dr. Tversky's Testimony at 5. But Defendants' position falls short on both the law and the facts. First, as this Court has held, "[T]o establish general causation, plaintiffs need not prove a toxic dosage... Instead, plaintiffs must demonstrate [the drug] 'is toxic to humans given substantial exposure.'" *In re Zicam Cold Remedy Mktg., Sales Practices, & Prods. Liab. Litig.*, 797 F. Supp. 2d 940, 946 (D. Ariz. 2011) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999)). Second, and importantly, here the evidence relied upon by Dr. Tversky and Plaintiffs' other experts demonstrates **retention and health effects with as little as a**

**single dose of a GBCA**. *See e.g.* Ex. 3, Rogosnitzky (2016); Ex. 4, Sherry (2009); Ex. 5, Newton (2009); Ex. 6, McDonald (2015); Ex. 7, Do (2014). Whether in a given patient a single dose triggers symptoms or multiple doses are required is not relevant at the general causation stage, as a single dose is clearly "substantial exposure." *In re Zicam*, supra, 790 F. Supp. 2d at 946.

## IV. DR. TVERSKY PROPERLY RELIED ON EXTENSIVE LITERATURE TO SUPPORT HIS OPINIONS.

Next, Defendants return to their refrain that there is not "a single study demonstrating that patients with normal renal function are at an increased risk of any adverse health effects." Doc. 77, Motion to Exclude Dr. Tversky's Testimony at 5. But again, Defendants' arguments fail on both the law and the facts. First, it is well settled in the Ninth Circuit that a plaintiff is not required to put forward *any* epidemiological evidence in order to for his expert to clear a general causation *Daubert* challenge. *See*, *e.g.*, *Wendell v. GlaxoSmithKline*, 858 F.3d 1227, 1236 (2017) (absence of epidemiological studies does not prevent admissibility of expert testimony on general causation).

Second, Dr. Tversky's extensively annotated report relies upon and references published literature reporting on animal studies, *in vitro* and *in vivo* studies, toxicological and mechanistic studies, observational studies, and case reports. See Doc 73-9, Tversky Report at pp. 16-19. He, like Plaintiffs' other experts, Drs. Brent Wagner and Margaret Whittaker, pulled together the available medical and scientific literature to get a view of the totality of the evidence, including the well-documented and researched emergence—and *decline*—of GBCA-induced NSF.

By way of example, the published literature upon which Dr. Tversky relies includes: Agarwal et. al. (2009) which is a comprehensive review and meta-analysis of NSF[2]; Do et. al. (2014) analyzing type of MRI contrast, tissue gadolinium and fibrosis[3]; Gibby et. al.

---

[2] Doc 73-9 Tversky Report at ref. 61, Ex. 14 Agarwal (2014).
[3] *Id.* at ref. 26, Ex. 7, Do (2014).

(2004) demonstrating GBCA retention in human bone tissue[4]; Kanda et. al. (2014) demonstrating retention in the human brain[5]; Knoepp et. al. (2017) demonstrating the effect of GBCAs on human epithelial channels[6]; and Gathings et. al. describing Gadolinium-associated plaques.[7]

All of the information and materials Dr. Tversky reviewed properly informed his general causation opinions, and Defendants' continued hyper-focus on the lack of a double-blind, case-controlled study in humans with healthy kidney function is both myopic and deliberately obfuscating. Ninth Circuit *Daubert* authority does not require what Defendants demand, and the scientific community has observed that such a study would be impracticable and unethical. *See, e.g.* Dekkers et. al. (2018) ("To test the association between Gd and clinical symptoms, one would ideally do a prospective study with clinical symptoms as the study outcome, whereby the patients are randomised for receiving contrast agents or not. However, a prospective study on rare clinical outcomes is impracticable since very large sample sizes are needed and are, furthermore, unethical.") Doc. 73-9 at ref. 52, Ex. 12, Dekkers (2018).

### V. DR. TVERSKY PROPERLY FINDS CAUSATION TO A REASONABLE MEDICAL PROBABILITY.

Next, Defendants incorrectly claim that Dr. Tversky assumed causation and merely set out to disprove it and that he must be therefore be excluded because he cannot conclusively "establish" causation. Defendants are wrong again.

Dr. Tversky did not assume causation. His review started with the questions posed to him, *supra*, and he fully evaluated the available evidence to form opinions to a reasonable degree of medical and scientific probability. Defendants' suggestion that he assumed the conclusion and then set out to show it has not been disproven is a gross

---
[4] *Id.* at ref. 5, Ex. 8, Gibby (2004).
[5] *Id.* at ref. 13, Ex. 9, Kanda (2014).
[6] *Id.* at ref. 45, Ex. 10, Knoepp (2017).
[7] *Id.* at ref. 37, Ex. 11, Gathings (2015).

mischaracterization of his report and his testimony—including and especially that portion of the testimony Defendants cite to support their complaint. Doc. 77, Motion to Exclude Dr. Tversky's Testimony at 7. By suggesting that Plaintiffs' must conclusively establish causation, Defendants mis-frame the general causation question and unduly heighten Plaintiffs' burden. As Dr. Tversky stated in his report and testified at his deposition, he used a standard of reasonable medical probability as he does in his practice. *See* Doc. 73-9, Tversky Report at 2; Doc. 73-5, Tversky Depo. at 153:25-1554:4; see also *Wendell,* 858 F.3d at 1233-35 (approving doctors' use of same methodology in their expert testimony as they use in their medical practices).

### VI.     DR. TVERSKY CONSIDERED THE STATEMENTS OF FDA AND OTHER REGULATORY BODIES.

Although the opinions of third-party regulatory bodies and professional societies cannot be dispositive on the question of whether a litigant's proof chins the *Daubert* bar, Dr. Tversky nonetheless considered the statements and positions at issue here. In both his Report and deposition, Dr. Tversky demonstrates that he evaluated the position of both the FDA and European Medicines Agency (EMA) with respect to linear GBCAs. Doc. 73-9, Tvserky Report at 8. He also correctly testified in his deposition that he approached his task here as a physician, a different standard than the risk/benefit analysis conducted by regulatory bodies:

> My job is simply to review the data as much as I can and make a determination based on the probability of that data whether or not there's a relationship. And the FDA operates under a different guidelines and under different conditions and with different questions."

Doc. 73-5, Tversky Depo. at 165:14-20.

As in each of their other briefs, Defendants spend several pages of their instant *Daubert* challenge repeating the statements of FDA, EMA and several professional trade groups, all of which admittedly have failed to announce a causal connection between

8

GBCAs and the injuries at bar. Of course, if FDA's say-so definitively decided questions of causation for pharmaceutical or medical device agents, the exercise of retaining experts would be unnecessary—indeed, *Daubert* gatekeeping would presumably cease to exist in cases involving an FDA-approved product. But that is not the law. Defendants overstate the legal significance of these statements and opinions by third-parties—third parties that will never be before this Court and whose scientific and medical decision-making will not be held to the *Daubert* standard or subject to the test of vigorous cross-examination. At best, FDA's position is a matter of weight, as are the positions of the various other entities to which Defendants point.

Moreover, as a substantive matter, while these third-party entities have not yet gone as far as Plaintiffs' experts' opinions, their positions are hardly inconsistent. Indeed, FDA's 2018 warnings clearly alert physicians to some adverse health effects related to GBCAs in patients with normal renal function.[8] And it must not be lost in the discussion that the EMA **has suspended linear agents**. Doc. 73-34, EMA's Final Opinion Confirms Restrictions on Use of Linear Gadolinium Agents in Body Scans on July 20, 2017.

### VII. CASE REPORTS AND SURVEY EVIDENCE PROPERLY SUPPORT DR. TVERSKY'S OPINIONS.

Defendants also challenge Dr. Tversky's reliance on case reports, including adverse events reported by industry to FDA in the FDA Adverse Event Reporting System (FAERS) database. Yet, as Defendants acknowledge, Dr. Tversky has not placed undue weight or importance on this data. Doc. 77, Motion to Exclude Dr. Tversky's Testimony at 12. Rather, the case reports he reviewed are merely a threshold building block in his overall analysis. For example, the fact that NSF virtually disappeared once radiologists stopped

---

[8] Doc. 73-47, FDA Drug Safety Communication: FDA warns that gadolinium-based contrast agents (GBCAs) are retained in the body; requires new class warnings on Dec. 19, 2017 ("We have also received reports of adverse events involving multiple organ systems in patients with normal kidney function."); *See also* Doc. 73-30, Magnevist Label at section 5.3; Doc. 73-31, MultiHance Label at section 5.3; Doc. 73-32, OptiMARK Label at section 5.3.

using GBCAs in renally impaired patients is powerful evidence of cause and effect on a population level.  *See, e.g.* Doc. 73-5, Tversky Depo. at 276: 15-22 ("For example, if we removed linear gadolinium agents from the picture in patients with renal disease, did we see a drop-in incidence?  Yes, we did.  Is this published? It's published….  Have we seen an emergence of reports among patients that are renally sufficient? We have.")  *See also* Doc. 73-9, Tvserky Report at 9 ("Since the use of gadolinium has been restricted in renally insufficient patients over the past ten years, there has been a dramatic decrease in NSF cases reported.  This reduction provides strong confirmatory evidence of a causative effect of gadolinium in NSF.") As Dr. Tversky notes, the toxicity of gadolinium in the body is not vitiated by normal kidney function.  *Id.*  The severity of symptoms range on a continuum from mild to NSF-like.  This "continuum" is well documented and supported by multiple lines of evidence. *See, e.g.*, Plaintiffs' Opposition to Motion to Exclude Dr. Wagner's Testimony, Ex. 22, Dr. Desche's testimony for FDA at 105:20-106:8.

Dr. Tversky points out, as does Dr. Whittaker, a large number of FAERS reports related to effects of GBCA.  Dr. Tversky notes 14,000 reports.  While some of these relate to NSF, as defendants insist, NSF was rare—perhaps 1,000-1,500 cases—and has virtually disappeared since the 2007 black box warning and contraindication for patients with impaired renal function.  The necessary inference is that the overwhelming number of reports are from people with normal renal function.  Moreover, as Defendants have argued to FDA, adverse event reports are under reported to FDA by a factor of **at least 10**.



[redacted]

Plaintiffs' Omnibus Brief in Opposition to Defendants' Motion to Exclude Testimony, Ex. 37, [redacted]

Of course, given that Gadolinium Deposition Disease was first identified by Richard Semelka M.D. as a "clinical entity" in 2016, the likelihood of a clinician reporting such a finding to FDA is minimal. Ex. 2, Semelka (2016). In sum, the case reports and FAERS data base, while not dispositive, are relevant evidence that Dr. Tversky appropriately weighed and evaluated in forming his opinion. See *Wendell,* 858 F.3d at 1236 ("Although case studies alone generally do not prove causation, they 'may support other proof of causation.'" (citing *Rider v. Sandoz Pharm. Corp.,* 295 F. 3d 1194, 1199 (11th Cir. 2002).)

### VIII. DR. TVERSKY PROPERLY UTILIZES THE ARTICLES HE RELIES UPON.

Defendants claim that Dr. Tversky "ignores" the conclusions of the articles he cites, Doc. 77, Motion to Exclude Dr. Tversky's Testimony at 12, but provide no evidence that he inaccurately characterized or misunderstood the articles. Indeed, the Ranga, McDonald, and Lohrke article statements that the Motion cites do not adopt a position that GBCAs are benign, but at best state that the effects are "unknown." Lohrke, authored by Bayer scientists, in fact states that the "**Gadolinium (Gd), dissociated from its ligand and present as a new Gd species, can have adverse biological effects**." Doc. 73-21, Lohrke (2017).

### IX. DR. TVERSKY'S CAUSATION OPINION IS WELL SUPPORTED, AND HE PERFORMS A SOUND BRADFORD HILL ANALYSIS.

Defendants make a conclusory attack upon the Bradford Hill analysis performed by Dr. Tversky by taking sentence fragments from his report and deposition and claiming, essentially, that it is impossible to do a Bradford Hill analysis in this case because there is no epidemiology study to support it. Doc. 77, Motion to Exclude Dr. Tversky's Testimony at 16-17. However, the type of epidemiology study Defendants demand here as prerequisite to a Bradford Hill analysis is often not available and is not a requirement for admissible expert testimony. See, e.g. *Wendell*, 858 F.3d 1227; *see also Milward v. Acuity Specialty Prods. Grp., Inc.,* 639 F.3d 11, 24 (1st Cir. 2011) ("[E]xpert testimony may still be reliable and admissible without peer review and publication. *See Clausen,* 339 F.3d at 1056. That is especially true when dealing with rare diseases that do not impel published studies.")

Here, Dr. Tversky's report presents the evidence under each of the Bradford Hill criteria. Doc. 73-9, Tversky Report at 9-13. He absolutely relies, in part, upon the evidence adduced from NSF. To ignore that evidence and deem it irrelevant to the general causation inquiry with normal renal function would be a serious error, particularly in light of the general acceptance that the toxicity of GBCAs constitutes a continuum bounded on one end by NSF and at the other end by retention, with a spectrum of patients with normal renal function but nonetheless experiencing fibrosis and noticeable permanent symptoms in the middle of that continuum. *See, e.g.*, Plaintiffs' Opposition to Motion to Exclude Dr. Wagner's Testimony, Ex. 22, Dr. Desche's testimony for FDA at 105:20-106:8.

/ / /

## CONCLUSION

In conclusion, Dr. Tversky's report and his deposition testimony demonstrate that he is an exceptional physician with extensive clinical experience that he has brought to bear to offer truthful and important general causation testimony. Plaintiffs respectfully request that the Court deny the defendants' motion to exclude Dr. Tversky's testimony in its entirety.

Dated: May 3, 2019                               CUTTER LAW, P.C.

                                                 By:   /s/ C. Brooks Cutter
                                                       C. Brooks Cutter

                                                 C. Brooks Cutter (*pro hac vice*)
                                                 Todd A. Walburg (*pro hac vice*)
                                                 Margot P. Cutter (*pro hac vice*)
                                                 **CUTTER LAW, P.C.**
                                                 401 Watt Avenue
                                                 Sacramento, CA 95864
                                                 Telephone: (916) 290-9440
                                                 Facsimile: (916) 588-9330
                                                 Email: *bcutter@cutterlaw.com;*
                                                 *twalburg@cutterlaw.com;*
                                                 *mcutter@cutterlaw.com*

                                                 T. Matthew Leckman (*pro hac vice*)
                                                 **LITTLEPAGE BOOTH LECKMAN**
                                                 1912 W. Main Street
                                                 Houston, Texas 77098
                                                 Telephone: (713) 529-8000
                                                 Facsimile: (713) 529-8044

                                                 Attorneys for the Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2019, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/ C. Brooks Cutter*