Jennifer Greenblatt (*pro hac vice*)
Andrew Goldman (*pro hac vice*)
Allyson Julien (*pro hac vice*)
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
564 West Randolph Street, Ste. 400
Chicago, Illinois 60661
(312) 681-6000
jgreenblatt@goldmanismail.com
agoldman@goldmanismail.com
ajulien@goldmanismail.com

Kenneth Baum (*pro hac vice*)
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
429 Santa Monica Blvd., Ste. 710
Santa Monica, CA 90401
(310) 576-6900
kbaum@goldmanismail.com

Jeffrey B. Molinar, No. 018512
Joseph N. Roth, No. 025725
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
jmolinar@omlaw.com
jroth@omlaw.com

Attorneys for Defendants Bayer HealthCare Pharmaceuticals Inc.,
Bayer Corporation, and Bayer HealthCare LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Susan Fischer,<br><br>        Plaintiff,<br>vs.<br><br>Bayer HealthCare Pharmaceuticals Inc., et al.,<br><br>        Defendants. | Case No. 2:18-CV-01778-DGC<br>Case No. 2:18-CV-01157-DGC<br>Case No. 2:18-CV-01159-DGC<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF OMNIBUS MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERTS** |

| | |
|---|---|
| Hilary Davis, | |
| | Plaintiff, |
| vs. | |
| McKesson Corporation, et al., | |
| | Defendants. |

| | |
|---|---|
| Srihari Munnuru, | |
| | Plaintiff, |
| vs. | |
| Guerbet, LLC, et al., | |
| | Defendants. |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 1

I.    Plaintiffs' Experts' Causation Theories Satisfy No Indicia of Reliability. ............. 2

       A.    Plaintiffs' Experts Fail All Four *Daubert* Factors. ................................... 3

       B.    Plaintiffs Do Not Dispute That Their Experts Ignored Every Single Controlled Human Study. ............................................................................ 6

       C.    Plaintiffs Fail to Bridge the Analytical Gaps in Their Experts' Methodologies. ......................................................................................... 8

       D.    Plaintiffs' Parroting of the Bradford Hill Criteria Does Not Absolve Their Experts' Methodological Failures. ................................................. 12

II.   Plaintiffs' Experts' Opinions Violate Rule 702's Relevance Requirements. ....... 13

CONCLUSION ........................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Cabrera v. Cordis Corp.*,
　134 F.3d 1418 (9th Cir. 1998) ............................................................. 9

*Claar v. Burlington N. R.R. Co.*,
　29 F.3d 499 (9th Cir. 1994) .................................................................. 7

*Daubert v. Merrell Dow Pharm., Inc.*,
　43 F.3d 1311 (9th Cir. 1995) ............................................................... 4

*Domingo ex rel. Domingo v. T.K.*,
　289 F.3d 600 (9th Cir. 2002) ............................................................. 12

*Gen. Elec. Co. v. Joiner*,
　522 U.S. 136 (1997) ............................................................................ 9

*Grant v. Bristol-Myers Squibb*,
　97 F. Supp. 2d 986 (D. Ariz. 2000) ............................................... 1, 5

*Henderson v. Kennedy*,
　253 F.3d 12 (D.C. Cir. 2001) .............................................................. 9

*In re Human Tissue Prod. Liab. Litig.*,
　582 F. Supp. 2d 644 (D.N.J. 2008) .................................................... 7

*In re Mirena Prod. Liab. Litig. (No. II)*,
　341 F. Supp. 3d 213 (S.D.N.Y. 2018) ............................................... 4

*In re Nexium Esomeprazole*,
　662 F. App'x 528 (9th Cir. 2016) ..................................................... 13

*In re Rezulin Prod. Liab. Litig.*,
　369 F. Supp. 2d 398 (S.D.N.Y. 2005) ........................................ 8, 11

*Kumho Tire Co., Ltd. v. Carmichael*,
　526 U.S. 137 (1999) ............................................................................ 4

*Lopez v. Wyeth-Ayerst Labs., Inc.*,
　139 F.3d 905 (9th Cir. 1998) (unpublished) .................................... 10

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
　950 F. Supp. 981 (C.D. Cal. 1996) .................................................. 11

*Turner v. Iowa Fire Equip. Co.*,
　229 F.3d 1202 (8th Cir. 2000) ........................................................ 5, 7

ii

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001)......................................................................5

**Rules & Regulations**

Fed. R. Evid. 702 ...........................................................................................2

## INTRODUCTION

Plaintiffs' opposition affirms the inescapable: there is no reliable evidence that retained gadolinium from the use of gadolinium-based contrast agents causes clinical harm in patients with normal kidney function. To dodge this glaring reality, Plaintiffs ask the Court to jettison its Rule 702 inquiry and instead delegate its gatekeeping duties to the jury. To try to salvage their experts' testimony, they cite to tangential company witness deposition testimony and internal company documents—none of which their experts relied upon *or even reviewed*. To distract from the absence of support, Plaintiffs dedicate large swaths of their brief to discussing nephrogenic systemic fibrosis (NSF)—a medical condition that by its very definition excludes all three Plaintiffs. To deflect from their experts' opinions not fitting the actual injuries alleged, they interject attorney characterizations of Plaintiffs' depositions and medical records sponsored by no expert.

Plaintiffs concede that their experts' general causation opinions and their underlying methodologies satisfy no indicia of reliability. Plaintiffs admit that their experts' theories fail to satisfy any of the four *Daubert* factors. They grant that their experts engaged in cherry-picking to arrive at their opinions—ignoring all of the epidemiological studies that speak directly to the question of general causation at issue here. They gloss over the analytical gaps in their experts' methodologies filled solely by their *ipse dixit*. Given ample opportunity, Plaintiffs fail to meet their burden to show that their "expert witness testimony is admissible pursuant to Rule 702 and the *Daubert* standards." *Grant v. Bristol-Myers Squibb*, 97 F. Supp. 2d 986, 989 (D. Ariz. 2000). Because their methodologies are unreliable and their opinions are not tailored to the injuries alleged, Plaintiffs' experts' general causation opinions require exclusion.[1]

## ARGUMENT

---

[1] Plaintiffs never deposed nor moved to exclude any opinions of Defendants' experts, whose reports are attached as Exs. 50, 51, 52, 53, 54, 55, and 56. The Court need not consider these reports to exclude Plaintiffs' experts, but it is telling that Plaintiffs do not challenge their methodology that leads to the same conclusion reached by the entire scientific community—there is no reliable evidence of a causal relationship.

**I. Plaintiffs' Experts' Causation Theories Satisfy No Indicia of Reliability.**

Plaintiffs must demonstrate that their experts' "testimony is based on sufficient facts or data" and "is the product of reliable principles and methods" that have been "reliably applied" to the "facts of the case." Fed. R. Evid. 702. Plaintiffs distort this inquiry beyond recognition. They miscast the Ninth Circuit's *Wendell* decision as doing away with the *Daubert* inquiry altogether and suggest that the *In re Gadolinium-Based Contrast Agents ("GBCAs") Prods. Liab. Litig.* NSF-related *Daubert* decision requires the admission of their experts. Both assertions are wrong.

*Wendell* does not render Rule 702's admissibility standards a nullity as Plaintiffs submit. The decision did, however, confirm something not in dispute here—no single indicator of reliability is dispositive. But there is no suggestion that the *Wendell* experts who were permitted to offer their opinion failed every *Daubert* factor—as Plaintiffs effectively concede that their experts do here. Nor is there any intimation that the experts in *Wendell* ignored every available epidemiological study on the issue—as Plaintiffs admit that their experts do here. To the contrary, the *Wendell* experts relied on published statistical risk studies as to the condition at issue. The *Wendell* court also did not approve of a methodology based on cherry-picked statements from authors drawing opposite conclusions—which Plaintiffs' experts repeatedly do here. Stated simply, the experts challenged in *Wendell* did not employ a methodology that violates every indicia of reliability—as Plaintiffs' experts do here. What's more, the underlying injury at issue in *Wendell* was a rare, but distinct form of cancer recognized by the medical community, which stands in stark contrast to the everchanging constellation of generic, non-overlapping symptoms unmoored to any recognized disease process that Plaintiffs claim here. *See* Def. Br. App'x A (reproduced below).

Plaintiffs' attempts to pillage support from *In re GBCAs* are also misguided. *See, e.g.*, Pl. Opp. at 1-4. That opinion involved a completely different injury (NSF), an entirely different patient population (those with "severe kidney disease"), a different

GBCA product (not at issue here), and a different manufacturer (not before this Court).[2] Here, Plaintiffs maintain that "[i]mportantly" chemist Kenneth Raymond, Ph.D. "cleared *Daubert* and testified for the plaintiffs in the NSF MDL" and that he, and by association their other three experts, *de facto* should be permitted to testify as to general causation here. Pl. Opp. at 9. But Plaintiffs neglect to mention that prior to the *Daubert* proceedings, the plaintiffs in the NSF MDL stipulated that Dr. Raymond would ___**not**___ offer any general causation opinions. *See* Ex. 57 at 2 (agreeing to "withdraw any opinion or testimony by Dr. Raymond that GBCAs generally…cause[ ] NSF" and "that free gadolinium causes NSF"). Even the opinion portions lifted by Plaintiffs make clear that the state of scientific support in that NSF litigation stands in stark contrast to the dearth of support here. *See* Pl. Opp. at 4 (citing *In re GBCAs*, 2010 WL 1796334, at *6 (noting "the majority view in the published and peer reviewed studies and articles that dechelated gadolinium causes NSF")). Thus, the idea that Defendants' *Daubert* motions are foreclosed by a non-controlling, unpublished decision on a motion in which Defendants were not involved, where the only overlapping plaintiff expert agreed to withdraw his general causation opinions, and where the "majority view in the published and peer reviewed studies" supported those plaintiffs' NSF injury claim, is absurd.

With Rule 702 properly framed, Plaintiffs fail to show that their experts' theories and underlying methodologies satisfy any indicia of reliability—*Daubert* or otherwise.

## A. Plaintiffs' Experts Fail All Four *Daubert* Factors.

Plaintiffs do not dispute that none of their experts' general causation theories meet any of *Daubert*'s indicia of reliability. Rather than grappling with these core reliability failures, Plaintiffs argue that no single *Daubert* factor is dispositive (which Defendants never suggested). But before admitting testimony where an expert's opinion "fail[s] all four *Daubert* reliability factors," "a court must 'carefully scrutinize,' pause, and take a 'hard look' at the expert's methodology." *In re Mirena Prod. Liab. Litig. (No.*

---

[2] In fact, Bracco, the manufacturer of MultiHance, was voluntarily dismissed from the NSF MDL, and MultiHance is not contraindicated in patients with renal impairment.

*II)*, 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018) (citation omitted). That "hard look," which is required here, shows that Defendants' *Daubert* motions should be granted.

### ***Plaintiffs Concede That Their Unpublished General Causation Theories Were Created for Litigation***:
Plaintiffs fail to identify a single publication, presentation, or any other forum where their experts subjected their respective general causation theories to review by their peers.[3] That is because their experts have never done so. Pl. Opp. at 16. Plaintiffs insist that this factor is not dispositive, but do not dispute its import on the reliability of their experts' opinions. Their experts' decision to debut their theories in this litigation undermines the reliability of their testimony. Def. Br. at 11-12.

### ***Plaintiffs Concede That Their Experts Left Their Causation Theories Untested – Leaving the Error Rate Unknown***:
Plaintiffs cast aside their experts' failure to test the litigation causation theories, declaring that factor a "mirror of the[] 'publication'" requirement, Pl. Opp. at 17, but the Ninth Circuit has explained that "[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Plaintiffs silently concede that their experts fall short of yet another benchmark of reliability. Def. Br. at 13. Furthermore, they casually refer to GBCAs as "toxic," *e.g.*, Pl. Opp. at 17; yet none of their experts could identify a threshold exposure level at which retained gadolinium supposedly causes adverse effects. Def. Br. at 13.

### ***Plaintiffs Concede that Their Experts' General Causation Theory Is Not***

---

[3] Their only attempt to do so involves directing the Court to Dr. Wagner's CV in a footnote with no specific citation and referring the Court to Leyba (Mar. 2019), which Dr. Wagner co-authored. *See* Pl. Opp. at 16 n.10; Pl. Ex. 4. But even in this publication, Dr. Wagner does not state that GBCA exposure causes clinical harm in patients with normal kidney function. In fact, he concedes that "the clinical consequences of gadolinium-based contrast agent retention in the brain have not been well defined" and expresses the "pressing need for empirical, experimental data to inform clinical guidelines." *Id.* His published statements reveal that, to this day, he does not employ the same "intellectual rigor" to reach his opinion in this litigation as he does outside of the courtroom. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

1 ***Generally Accepted***: Plaintiffs repeat their refrain that general acceptance is not

2 "required…as a threshold for admissibility"—an argument Defendants never advanced.

3 Pl. Opp. at 17. Plaintiffs do not contest that their experts' general causation opinions—

4 that retained gadolinium from GBCAs causes adverse clinical effects in humans with

5 normal kidney function—have not been generally accepted in the scientific, regulatory,

6 or medical community. Pl. Opp. at 17; *Grant v. Bristol-Myers Squibb*, 97 F. Supp. 2d

7 986, 991 (D. Ariz. 2000) (excluding expert whose causation "theories" "are not

8 generally accepted by [the] scientific community").

9        Plaintiffs deploy red herrings to distract from the admitted novelty of their

10 litigation theory. Def. Ex. 4, Raymond Dep. at 68:19-69:2 ("[T]he relationship between

11 gadolinium deposition and disease is one that's ***still being established***." (emphasis

12 added)). First, they offer cavalier lawyer-crafted interpretations of the FDA's assessment

13 of general causation—not advanced by any expert and based on company documents and

14 company witness depositions that none of their experts reviewed. Pl. Opp. at 13-15. Not

15 only does this violate Rule 26, but also Plaintiffs' experts' methods cannot be

16 retroactively bolstered with materials they never considered and theories they never

17 postulated. *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000) (finding

18 plaintiffs' citation to materials the expert "simply did not rely upon . . . in formulating

19 his opinion" "would not save [his] causation opinion from exclusion"); *Yeti by Molly,*

20 *Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) . . .

21 forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is

22 not properly disclosed."). Even if they could backfill their experts' opinions at this late

23 stage, Plaintiffs' assertion that the "FDA[']s actions with respect to linear GBCAs

24 support the position taken by Plaintiffs' experts," Pl. Opp. at 15, cannot be harmonized

25 with the FDA's December 2017 statement that "[g]adolinium retention ***has not been***

26 ***directly linked*** to adverse health effects in patients with normal kidney function," or with

27 the 2018 FDA-approved, revised GBCA labels that state "clinical consequences of

28 gadolinium retention ***have not been established*** in patients with normal renal function."

*See* Def. Exs. 30, 47 (emphases added).

Second, Plaintiffs try to discredit the medical, scientific, and regulatory communities with conspiratorial undertones, writing "[n]either the inaction of regulatory agencies nor the complicity of professional trade groups should bear on a *Daubert* inquiry." Pl. Opp. at 2. Plaintiffs' disparagement of these organizations is inconsistent with the words of their own experts. Their experts affirmatively rely on statements by these groups (albeit while ignoring their actual conclusions). Def. Br. at 15-16. While Plaintiffs dismiss the National Institutes of Health as a "complicit[]" "trade group," their expert Dr. Raymond described NIH as "reliable." Def. Ex. 4, Raymond Dep. at 103:10-19. And that "reliable" organization, as with all others weighing in, concluded that an "association of [] symptoms with GBCA administration or gadolinium retention has not been proven by scientific investigation." Def. Br. at 8.

Finally, Plaintiffs point to the suspension of the use of some linear GBCAs by the European Medicines Agency (EMA) and South Korean authorities as evidence of causation of injury in patients with normal kidney function. Pl. Opp. at 15-16. In doing so, Plaintiffs continue the trend of their experts—citing materials for one proposition when they conclude another. They disregard the EMA's statement that "[t]here is currently no evidence that gadolinium deposition in the brain has caused any harm to patients." Def. Br. at 8. They also ignore the statement in the Choi (2019) article cited, which none of their experts reviewed, that "***little is known*** about the clinical importance of gadolinium accumulation in the brain." Pl. Ex. 24 at 142 (emphasis added).

Misdirection aside, when the experts themselves were asked, they were unable to identify ***any*** entity—not the FDA, the EMA, or the South Korean authorities—that has ever found that GBCA use causes the clinical harm alleged in patients with normal kidney function. Def. Br. at 1, 12-13.

**B.** **Plaintiffs Do Not Dispute That Their Experts Ignored Every Single Controlled Human Study.**

Plaintiffs, on one hand, make sweeping claims that "[a]ll four experts conducted

an extensive literature review . . . in order to evaluate the general causation issue." Pl. Opp. at 9. On the other hand, Plaintiffs admit that none of their experts reviewed *any* of the clinical studies that specifically investigated the very issue at hand—whether GBCA use puts patients with normal kidney function at increased risk for clinical harm—before opining on supposed clinical effects of GBCAs. *Id.* at 18.

Far from a coincidental oversight (as Plaintiffs intimate), this unanimous failure to consider any of the clinical studies was nothing short of willful. Drs. Whittaker, Wagner, and Tversky claim to have reviewed the FDA MIDAC Briefing Document, which has an entire section dedicated to the Welk study. Def. Ex. 43 at 92-98 (assessing Welk publication); Def. Ex. 11, Whittaker Rpt. at 42; Def. Ex. 10, Wagner Rpt. at 37; Def. Ex. 9, Tversky Rpt. at 16. Yet, these experts all inexplicably omitted this study from their analysis. Plaintiffs make much of Dr. Wagner's presence at and participation in the FDA's MIDAC meeting, but fail to explain how he then ignored the Welk and McDonald studies, both of which were presented at that very meeting. Def. Br. at 7; *see, e.g.,* Def. Ex. 43 at 92-98, 128. For their part, Plaintiffs themselves were well-aware of several of these studies. Plaintiffs' counsel attended the same MIDAC meeting as Dr. Wagner where the Welk and McDonald studies were presented, and the Parillo study was discussed in company witness depositions that predate the experts' reports. *See, e.g.*, Tversky Reply Ex. B, Desche Dep. at 102:9-103:11. This sort of cherry-picking is the hallmark of a conclusion-driven approach forbidden by Rule 702. *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis" of the scientific method.).

Plaintiffs do not, and cannot, cite any authority blessing a methodology that ignores *all* of the available epidemiological studies. To try to rehabilitate this flaw in their experts' methodology, Plaintiffs dedicate two pages of their brief to lawyer-generated criticisms of these published studies—backed by no expert. *Turner*, 229 F.3d at 1209; *In re Human Tissue Prod. Liab. Litig.*, 582 F. Supp. 2d 644, 667 (D.N.J. 2008) ("[A]rguments and extrapolations of counsel alone are not sufficient to prove the

reliability of the expert['s] conclusions" because if the expert "was unable to explain" the materials, "Plaintiffs' counsel cannot fill in the gaps."). Not only is Plaintiffs' assessment untimely, their interpretation of selective snippets from the articles is at odds with the conclusions drawn by the authors. Def. Br. at 13-15. On its face, Plaintiffs' deflection defies reason: if these studies supposedly "advance Plaintiffs' proof of general causation" as Plaintiffs now claim, Pl. Opp. at 19, they would have had no reason to wait until their *Daubert* opposition to acknowledge them. Plaintiffs were welcome to advance these (unfounded) criticisms through the proper channels—their experts; but counsel's after-the-fact musings do not remedy this gaping hole in their experts' methodology. *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 407 (S.D.N.Y. 2005) ("The subject of this motion is the proposed testimony of experts, not the theories of the lawyers.").

## C. Plaintiffs Fail to Bridge the Analytical Gaps in Their Experts' Methodologies.

Plaintiffs effectively concede their experts were unable to identify a single controlled epidemiologic study to back their causation opinions. They justify this absence with the assertion that "prospective, randomized, controlled human studies establishing epidemiological proof of GBCA harm in humans" cannot be completed "due to ethics limitations." Pl. Opp. at 12. But the terms "prospective" and "randomized" appear nowhere in Defendants' brief, and nowhere have Defendants asserted that such studies are required. Instead, Defendants argued, and Plaintiffs' opposition confirms, that these experts could identify no ***controlled*** clinical study (prospective or not, randomized or not) finding that patients with normal kidney function are at increased risk of any clinical harm—much less the symptoms Plaintiffs allege. Def. Br. at 16-17. This missing link is critical. In a controlled study, "the investigators determine which subjects are put into the treatment group and which are put into the control group." Ex. 58, Federal Judicial Center Reference Manual at 285. Those in the treatment group receive treatment—here, the administration of GBCAs—and "those in the control group are not so exposed." *Id.* Comparisons can then be made between the treatment and control

groups. *Id.* at 220. As discussed, controlled clinical studies investigating whether retained gadolinium from GBCA use increases the risk of clinical harm in patients with normal kidney function do in fact exist; they just do not support Plaintiffs' causation theory, and their experts ignored them. *See supra* at 6-8. Thus, Plaintiffs' tangent on the "ethics limitations" on prospective, randomized human studies is irrelevant.

With no epidemiological data, Plaintiffs double down on their experts' methodologically flawed reliance on case reports, patient surveys, animal studies, and NSF data. Pl. Opp. at 12. Plaintiffs try to sanitize their experts' conclusion-driven approach as a "generally accepted" methodology and downplay the pervasive analytical gaps between the data their experts cite and the conclusions drawn as a matter of "the correctness of the expert's conclusion." *Id.* at 17. Their experts' pattern of ignoring epidemiologic data contradicting their theory and instead relying on non-clinical data, reaching conclusions that directly conflict with those of the authors they cite, and relying on data which even they confess cannot establish causation, speaks directly to the soundness of their methodology. As the Supreme Court explained, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* Plaintiffs' response underscores that "there is simply too great an analytical gap" between the data their experts rely upon and the general causation conclusions they reach. *Id.* These individually unreliable data cannot be strategically combined to establish causation. *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) ("[I]n law as in mathematics zero plus zero equals zero.").[4]

---

[4] Should Plaintiffs now try to bridge this gap for Drs. Wagner and Tversky with their so-called experience "treat[ing] patients with gadolinium exposure," Pl. Opp. at 10, this is nothing more than unverifiable *ipse dixit*. The fact that a patient was "exposed" to GBCAs does not mean that his or her symptoms were *caused* by GBCAs. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) ("An opinion based on [] unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702.").

***Case Reports, Unpublished Adverse Event Reports (AERs), and Online Polls***:

The only evidence that Plaintiffs can muster in patients with normal kidney function is

"case reports, patient surveys, and the FDA Adverse Event Reports System ('FAERS')

database." Pl. Opp. at 5. But Plaintiffs leave unanswered how these sources can serve as

the bedrock of their experts' causation opinions when those same experts admit that

none of these data can reliably establish causation. Def. Br. at 17-18.

Plaintiffs assert that "[t]here are extensive case reports for people with ordinary

renal function experiencing the symptoms [Plaintiffs'] experts attribute to GBCAs," but

offer no further analysis. Pl. Opp. at 12. In doing so, they ask the Court to ignore what

case law makes clear: case reports "are not intended to reach conclusions as to

causation." *Lopez v. Wyeth-Ayerst Labs., Inc.*, 139 F.3d 905 (9th Cir. 1998)

(unpublished); *see also* Def. Br. at 17-18. Plaintiffs further do not contest that some of

the case reports on which their experts rely involve patients who did not receive the

intravenous administration of GBCAs at issue in this litigation. *Id.* at 18.

Plaintiffs distract from their experts' unequivocal concession that the FAERS

database, which hosts unpublished AERs reported to the FDA, "is not designed for

causation"[5] with company witness deposition testimony and internal documents that

their experts did not consider. Pl. Opp. at 12-13. Assuming Plaintiffs could overcome

*Daubert* with materials the experts did not consider, which they cannot, neither source

cited stands for the proposition that AERs establish causation. Their reference to an

internal document stating that AERs are "underreported" does not alter this fact.

Similarly, acknowledging that "FAERS data is an important tool for safety signaling" is

a far cry from conceding it is properly used as a method for analyzing causation. *Id.* at

13. Plaintiffs' suggestion otherwise evinces a misunderstanding of basic

pharmacovigilance principles.[6] No matter how many documents or deposition snippets

[5] Def. Ex. 5, Tversky Dep. at 191:13-192:6; Def. Ex. 6, Wagner Dep. at 159:4-11.

[6] The FDA has explained "safety signals" are "similar adverse events occurring with a
particular drug." Ex. 59, FDA, Adverse event reporting is valued information. "Signals

Plaintiffs string together, neither their experts nor the FDA itself considers FAERS data

reliable evidence of causation.[7] Neither do courts. *See* Def. Br. at 17-18. As for the

fundamental flaws that infect their experts' reliance on patient survey data, Plaintiffs

shed no further light beyond confirming that their experts relied on them. Pl. Opp. at 5.

In short, Plaintiffs provide no basis beyond their experts' *ipse dixit* to bridge the

analytical gaps between the causation opinions offered and the case reports, unpublished

AERs, and online polls on which their experts' opinions depend.

***<u>Animal and In Vitro Studies</u>***: Plaintiffs gloss over all of Defendants'

methodological challenges to their experts' reliance on animal and *in vitro* studies.

Instead of addressing them, Plaintiffs baldly state that animal studies "overwhelmingly

support the plaintiffs." Pl. Opp. at 12. They do not even try to drum up the "good

grounds" required for their extrapolation from animal and *in vitro* studies to reach

conclusions on causation in humans. *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950

F. Supp. 981, 997 (C.D. Cal. 1996); *In re Rezulin*, 369 F. Supp. 2d at 428-29 ("Caution

always must be used in extrapolating results in tissue culture to effects in live humans.").

Plaintiffs justify their reliance on non-clinical data by claiming that animal studies are

the best available evidence due to "ethics limitations" in conducting human studies. Pl.

Opp. at 12. As discussed, this excuse is laid bare by the publicly available human clinical

studies, detailed above, that their experts chose to ignore. Def. Br. at 13-15.

In addition, Plaintiffs do not contest any of the points raised by Defendants on the

specific animal studies cited. They are silent on their experts' reliance on studies

expressly stating "'results obtained in animal studies cannot be directly applied to

patients'" and on studies that directly contradict their experts' causation opinions. *See*

---

generally indicate the need for further investigation, which may or may not lead to the
conclusion that the product caused the event." Ex. 60, FDA, Guidance for Industry at 4.
At most, AERs can serve as signals, but further scientific investigation (i.e., controlled
studies) is required for assessing causation.

[7] *See* Def. Br. at 17-18; Ex. 61, FDA, Questions and Answers on FDA's Adverse Event
Reporting System at 4 ("Existence of a report does not establish causation.").

Def. Br. at 19. They are also silent on their experts' extrapolation from studies where the test animals' blood-brain barriers were intentionally manipulated or where GBCAs were injected directly into the brains of the animals (as opposed to intravenously). *Id.*

**_NSF Data_**: Plaintiffs recite NSF data throughout their brief and invite the Court to make the massive leap, as their experts do, from an association between some GBCAs and NSF in patients with kidney disease to a causal relationship between GBCAs and a wide assortment of clinical harm in patients with normal kidney function. Plaintiffs bridge this analytical gap with the bare assertion that "[t]he human studies concerning NSF overwhelmingly support plaintiffs." Pl. Opp. at 12.

Plaintiffs do not dispute that NSF is a disease that none of the Plaintiffs claim to have. Def. Br. at 19-21. They tellingly concede, by silence, that at least two key hallmarks of NSF are absent. Each Plaintiff's kidney function is normal, but NSF only occurs in patients with pre-existing kidney disease. And Plaintiffs admit that none of them has ever been diagnosed with fibrosis—a consensus diagnostic criterion for NSF. *Id.* Plaintiffs are resolute in their assertion that "the reason people with impaired renal function develop NSF is…because they retain gadolinium which causes fibrosis," Pl. Opp. at 5, while brushing aside their own experts' concession that there have been reported cases of NSF in patients never exposed to GBCAs. Def. Br. at 20. Plaintiffs' insistence that "gadolinium causes myriad adverse health effects on a continuum toward 'full-blown' NSF," Pl. Opp. at 2, requires them to ignore their experts' admissions that the mechanism of NSF is not "fully understood" and is "incomplete." Def. Br. at 20. "The reasoning between steps in a theory must be based on objective, verifiable evidence." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). Plaintiffs' experts' core assumption that the GBCAs at issue must cause random constellations of symptoms in patients with normal kidney function because there have been reports with some GBCAs of NSF in patients with impaired kidney function rests on speculation.

D. **Plaintiffs' Parroting of the Bradford Hill Criteria Does Not Absolve**

**Their Experts' Methodological Failures.**

Plaintiffs resort to their experts' purported use of the Bradford Hill criteria to distract from their methodological failures.[8] Pl. Opp. at 9-10. But courts, including the Ninth Circuit, have consistently held that an expert's claimed use of a Bradford Hill analysis does not immunize an expert from exclusion. *See In re Nexium Esomeprazole*, 662 F. App'x 528, 530 (9th Cir. 2016) (affirming exclusion of an expert who "analyzed three of the nine Bradford Hill factors" because the "analysis of the factors he did discuss was 'extremely thin'"). Moreover, Plaintiffs do not dispute that Sir Bradford Hill himself said his criteria may only be applied if a clear-cut case of association has been established. Def. Br. at 21. They make no such threshold showing.

## II. Plaintiffs' Experts' Opinions Violate Rule 702's Relevance Requirements.

Rule 702's requirement that Plaintiffs' experts' opinions have "a valid scientific connection to the pertinent inquiry" is not a conflation of specific and general causation. *Id.* at 22; Pl. Opp. at 7. Plaintiffs allege no overarching disease; instead, each alleges a wildly divergent range of common symptoms covering nearly every organ system. Def. Br. at 4-5; App'x A. Each case, thus, requires a case-specific inquiry into which "injuries and conditions [are] alleged by Plaintiffs." 7/17/18 CMO.

Plaintiffs do not demonstrate that their experts' opinions are relevant to the "injuries and conditions alleged" or the "exposure to gadolinium in the manner at issue in this case."[9] *Id.* Plaintiffs fail to explain why their experts offered no opinions on many of the "injuries and conditions alleged by Plaintiffs," including tooth pain, depression, and hair loss. Nor do they explain why their experts tie GBCAs to conditions not alleged. *Id.* at 22-23. Critically, their experts offer extensive opinions about purported

___

[8] They even go so far as to say that Dr. Wagner, who makes a passing reference to the Bradford Hill criteria in one sentence of his report, "employed the Bradford Hill criteria to evaluate general causation." Pl. Opp. at 10. As discussed in Defendants' motion to exclude Dr. Wagner and reply in support, he did no such thing.

[9] Plaintiffs concede that Dr. Raymond is unable to offer relevant clinical opinions. Pl. Opp. at 9. His opinions should be stricken as irrelevant due to this concession alone.

"fibrosis" due to gadolinium retention, but Plaintiffs concede that none of them has ever been diagnosed with fibrosis.[10] Pl. Opp. at 19-21. They do not justify their experts' reliance on gadolinium chloride data (a compound never used in humans). Def. Br. at 23.

Rather than meeting their burden to demonstrate relevance, Plaintiffs close with lawyer-crafted medical synopses of their medical records and depositions that are problematic on several fronts. Pl. Opp. at 20-23. First, these conclusions selectively culled from Plaintiffs' medical records and depositions are endorsed by no expert, which is unsurprising because their experts did not analyze or rely upon them. Second, Plaintiffs have now created yet another iteration of their alleged injuries that is different from their increasingly vague complaints and the laundry list of conditions given at each Plaintiff's deposition. Plaintiffs' alleged injuries have been a moving target since the start of this litigation. Def. Br. at 4-5. Their decision to move the goalpost again in their opposition—after their experts' reports have been submitted, after their experts' depositions have been completed, and after *Daubert* briefing was initiated—further underscores the disconnect between their experts' opinions and the injuries alleged. Finally, Plaintiffs direct the Court to purported treating physicians' (and in one case a dentist's) diagnoses in Plaintiffs' medical records of "Gadolinium Deposition Disease" and "gadolinium toxicity." Pl. Opp. at 20-23. But this violates the Court's July 17, 2018 Order, which required the parties to disclose "the identities of treating physicians and other witnesses who will provide testimony under Federal Rules of Evidence 702, 703, or 705." Plaintiffs chose not to disclose any of their treaters as non-retained experts. *See* Ex. 62, Pl. Discl. They cannot now offer their spin on those treaters' records to avoid *Daubert* exclusion of their four disclosed experts.

## CONCLUSION

Defendants respectfully request that the Court exclude Plaintiffs' experts' general causation opinions in their entirety.

---

[10] Plaintiffs' own summaries no longer allege fibrosis as an injury. Pl. Opp. at 20-23.

14

Dated: May 17, 2019             Respectfully submitted,

*/s/ Jennifer Greenblatt*
Jennifer Greenblatt (*pro hac vice*)
Andrew Goldman (*pro hac vice*)
Allyson Julien (*pro hac vice*)
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
564 W. Randolph St., Ste. 400
Chicago, IL 60661
Telephone: (312) 681-6000
Facsimile: (312) 881-5191
jgreenblatt@goldmanismail.com
agoldman@goldmanismail.com
ajulien@goldmanismail.com

Kenneth Baum (*pro hac vice*)
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
429 Santa Monica Blvd., Ste. 710
Santa Monica, CA 90401
Telephone: (310) 576-6900
Facsimile: (310) 382-9974
kbaum@goldmanismail.com

Jeffrey B. Molinar, No. 018512
Joseph N. Roth, No. 025725
OSBORN MALEDON, P.A.
2929 North Central Avenue
21st Floor
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
jmolinar@omlaw.com
jroth@omlaw.com

*Attorneys for Defendants Bayer
HealthCare Pharmaceuticals Inc.,
Bayer Corporation, and Bayer
HealthCare LLC*

Dated: May 17, 2019             */s/ Thomas N. Sterchi*
Thomas N. Sterchi (*pro hac vice*)

15

Paul S. Penticuff (*pro hac vice*)
BAKER STERCHI COWDEN & RICE LLC
2400 Pershing Road, Suite 500
Kansas City, Missouri 64108
Telephone: (816) 471-2121
Facsimile: (816) 472-0288
sterchi@bscr-law.com
penticuff@bscr-law.com

Donn Alexander, No. 019389
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Ave., Suite 2700
Phoenix, Arizona. 85004
Telephone: 602.263.1700
Facsimile: 602.651.7599
dalexander@jshfirm.com

*Attorneys for Defendant Bracco
Diagnostics, Inc.*

Dated: May 17, 2019

/s/ *Jamie L. Kendall*
Jamie L. Kendall (*pro hac vice*)
Brad M. Welsh (*pro hac vice*)
KENDALL LAW PC
1201 County Line Road – Suite G
Bryn Mawr, Pennsylvania 19010
Telephone: 610.756.0200
Facsimile: 610.756.0202
jkendall@tkfirm.com
bwelsh@tkfirm.com

Christina M. Vitale, No. 024071
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006
Telephone: 713.890.5764
Facsimile: 713.890.5001
christina.vitale@morganlewis.com

Brian W. Shaffer (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
Facsimile: 215.963.5001

Telephone: 215.963.5000
brian.shaffer@morganlewis.com

*Attorneys for Defendants Guerbet LLC*
*and Liebel-Flarsheim Company LLC*

Dated: May 17, 2019

/s/ *Patrick X. Fowler*
Patrick X. Fowler, No. 012144
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
pfowler@swlaw.com

Devin K. Ross (*pro hac vice*)
SHOOK, HARDY & BACON, LLP
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
dkross@shb.com

*Attorneys for Defendants Mallinckrodt*
*Inc. and Mallinckrodt LLC*

Dated: May 17, 2019

/s/ *Habib Nasrullah*
Habib Nasrullah (*pro hac vice*)
WHEELER TRIGG O'DONNELL LLP
370 17th Street, Suite 4500
Denver, CO 80202
Telephone: (303) 244 1960
Facsimile: (303) 244 1879
nasrullah@wtotrial.com

*Attorneys for Defendants McKesson*
*Corporation and McKesson Medical-*
*Surgical Inc.*

| | | Selected Injuries Alleged by Stage of Litigation | | |
|---|---|---|---|---|
| **Plaintiff** | **Initial Compl.** | **1st Am. Compl.** | **2d Am. Compl.** | **At Deposition** |
| **Fischer** | Gadolinium Deposition Disease ("GDD"); burning sensation; violent shaking; tremors; clouded mentation; confusion; weakness; fatigue; hypoglycemia; difficult, painful movement; low body temperature; inflammation, especially throughout her lymphatic system; muscle cramps; numbness; tingling sensation; aching joints; weight loss; hair loss; lumps and rashes on body; kidney damage; osteoporosis | Fibrosis and related injuries | Fibrosis and related injuries | Burning pain in various locations outside and inside the body, including esophagus, stomach, and eyes; "electricity crawling" sensation; cognitive difficulties; deep hip and joint pain; arm pain at injection site; skin darkening in hands |
| **Davis** | GDD; extreme cognitive impairment; difficult mentation; headaches; swollen, red, thickening, and peeling skin; pain throughout her body | GDD; extreme cognitive impairment; difficult mentation; headaches; swollen, red, thickening, and peeling skin; pain throughout her body | Fibrosis and related injuries | Cognitive impairment; loss of muscle tone; burning in all joints and muscles; muscle twitching; severe cramping; joint stiffening; bone pain; kidney pain; dental symptoms, including tooth and bone deterioration; calluses and other formation on skin; dizziness; numbness; headaches; swelling eyes; bumpy "chicken skin"; leg pain; anxiety; depression; GDD |
| **Munnuru** | GDD; weight loss; immobility; kidney impairment; stiffness; body aches; joint pain; brain fog | Fibrosis and related injuries | N/A | Leg stiffness and weakness; immobility; bone pain and popping joints; foot and calf pain; brain fog; eye pain; tooth pain; weight loss; stiffness, tightness in ribs; headaches; burning sensation in feet |

# CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2019, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Upon receipt of the Notice of Electronic Filing, a copy of the attached document and Notice of Electronic Filing will be mailed to the Honorable David G. Campbell.


   /s/ *Patrick X. Fowler*